# UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF INDIANA,
### INDIANAPOLIS DIVISION

KAREN E. ROACHE,

      **Plaintiff,**

    *vs.*                              **CAUSE NO.  1:14-cv-1446-SEB-DKL**

CAROLYN W. COLVIN, **Commissioner of Social Security,**

      **Defendant.**

## REPORT AND RECOMMENDATION

Plaintiff Karen E. Roache brings this suit for judicial review of the defendant Commissioner's denial of her application for Supplemental Security Income benefits under the Social Security Act.  The district judge referred the issues presented in this Cause to this magistrate judge for submission of a report and recommended disposition pursuant to 28 U.S.C. § 636(b)(1)(B).  *Order Referring Issues to Magistrate Judge* [doc. 13].

### Standards

Judicial review of the Commissioner's factual findings is deferential:  courts must affirm if her findings are supported by substantial evidence in the record.  42 U.S.C. § 405(g); *Skarbek v. Barnhart*, 390 F.3d 500, 503 (7th Cir. 2004); *Gudgel v. Barnhart*, 345 F.3d 467, 470 (7th Cir. 2003).  Substantial evidence is more than a scintilla, but less than a preponderance, of the evidence.  *Wood v. Thompson*, 246 F.3d 1026, 1029 (7th Cir. 2001).  If the evidence is sufficient for a reasonable person to conclude that it adequately supports the Commissioner's decision, then it is substantial evidence.  *Richardson v. Perales*, 402

U.S. 389, 401, 91 S.Ct. 1420, 28 L.Ed.2d 842 (1971); *Carradine v. Barnhart*, 360 F.3d 751, 758 (7th Cir. 2004).  This limited scope of judicial review derives from the principle that Congress has designated the Commissioner, not the courts, to make disability determinations:

> In reviewing the decision of the ALJ [administrative law judge], we cannot engage in our own analysis of whether [the claimant] is severely impaired as defined by the SSA regulations.  Nor may we reweigh evidence, resolve conflicts in the record, decide questions of credibility, or, in general, substitute our own judgment for that of the Commissioner.  Our task is limited to determining whether the ALJ's factual findings are supported by substantial evidence.

*Young v. Barnhart*, 362 F.3d 995, 1001 (7th Cir. 2004).  *Carradine*, 360 F.3d at 758.  While review of the Commissioner's factual findings is deferential, review of her legal conclusions is *de novo*.  *Jones v. Astrue*, 623 F.3d 1155, 1160 (7th Cir. 2010).

The Social Security Act defines disability as the "inability to engage in any substantial gainful activity by reason of any medically-determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months . . . ."  42 U.S.C. § 423(d)(1)(A); 20 C.F.R. § 404.1505(a).  42 U.S.C. § 1382c(a)(3)(A); 20 C.F.R. § 416.905(a).  A person will be determined to be disabled only if his impairments "are of such severity that he is not only unable to do his previous work but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy, regardless of whether such work exists in the

immediate area in which he lives, or whether a specific job vacancy exists for him, or whether he would be hired if he applied for work."  42 U.S.C. §§ 423(d)(2)(A) and 1382c(a)(3)(B). 20 C.F.R. §§ 404.1505, 404.1566, 416.905, and 416.966.  The combined effect of all of an applicant's impairments shall be considered throughout the disability determination process. 42 U.S.C. ▪§ 423(d)(2)(B) and 1382c(a)(3)(G).  20 C.F.R. §§ 404.1523 and 416.923.

The Social Security Administration has implemented these statutory standards in part by prescribing a "five-step sequential evaluation process" for determining disability. If disability status can be determined at any step in the sequence, an application will not be reviewed further.  At the first step, if the applicant is currently engaged in substantial gainful activity, then he is not disabled.  At the second step, if the applicant's impairments are not severe, then he is not disabled.  A severe impairment is one that "significantly limits [a claimant's] physical or mental ability to do basic work activities."  Third, if the applicant's impairments, either singly or in combination, meet or medically equal the criteria of any of the conditions included in the Listing of Impairments, 20 C.F.R. Pt. 404, Subpt. P, Appendix 1, Part A, then the applicant is deemed disabled.  The Listing of Impairments are medical conditions defined by criteria that the Social Security Administration has pre-determined are disabling. 20 C.F.R. ▪ 404.1525.  If the applicant's impairments do not satisfy the criteria of a listing, then her residual functional capacity ("RFC") will be determined for the purposes of the next two steps. RFC is an applicant's

ability to do work on a regular and continuing basis despite his impairment-related physical and mental limitations and is categorized as sedentary, light, medium, or heavy, together with any additional non-exertional restrictions.   At the fourth step, if the applicant has the RFC to perform his past relevant work, then he is not disabled.   Fifth, considering the applicant's age, work experience, and education (which are not considered at step four), and his RFC, the Commissioner determines if he can perform any other work that exists in significant numbers in the national economy.   42 U.S.C. ▪ 416.920(a)

The burden rests on the applicant to prove satisfaction of steps one through four. The burden then shifts to the Commissioner at step five to establish that there are jobs that the applicant can perform in the national economy.   *Young v. Barnhart*, 362 F.3d 995, 1000 (7th Cir. 2004).   If an applicant has only exertional limitations that allow her to perform the full range of work at her assigned RFC level, then the Medical-Vocational Guidelines, 20 C.F.R. Part 404, Subpart P, Appendix 2 (the "grids"),  may be used at step five to arrive at a disability determination.   The grids are tables that correlate an applicant's age, work experience, education, and RFC with predetermined findings of disabled or not-disabled.   If an applicant has non-exertional limitations or exertional limitations that limit the full range of employment opportunities at his assigned work level, then the grids may not be used to determine disability at that level.   Instead, a vocational expert must testify regarding the numbers of jobs existing in the economy for

4

a person with the applicant's particular vocational and medical characteristics.  *Lee v. Sullivan*, 988 F.2d 789, 793 (7th Cir. 1993).  The grids result, however, may be used as an advisory guideline in such cases.

An application for benefits, together with any evidence submitted by the applicant and obtained by the agency, undergoes initial review by a state-agency disability examiner and a physician or other medical specialist.  If the application is denied, the applicant may request reconsideration review, which is conducted by different disability and medical experts.  If denied again, the applicant may request a hearing before an administrative law judge ("ALJ").[1]  An applicant who is dissatisfied with the decision of the ALJ may request the SSA's Appeals Council to review the decision.  If the Appeals Council either affirms or declines to review the decision, then the applicant may file an action in district court for judicial review.  42 U.S.C. ▪ 405(g).  If the Appeals Council declines to review a decision, then the decision of the ALJ becomes the final decision of the Commissioner for judicial review.

---

[1] By agreement with the Social Security Administration, initial and reconsideration reviews in Indiana are performed by an agency of state government, the Disability Determination Bureau, a division of the Indiana Family and Social Services Administration.  20 C.F.R. Part 404, Subpart Q (▪ 404.1601, *et seq.*).  Hearings before ALJs and subsequent proceedings are conducted by personnel of the federal Social Security Administration.

**Background**

Ms. Roache applied for S.S.I. benefits on March 29, 2012.  Her claim was denied on initial, (R. 58, 63), and reconsideration, (R. 59, 60, 74), reviews.  A hearing was held before an ALJ on May 16, 2013, at which a vocational expert testified.  (R. 35.)  Ms. Roache was represented during the pre-hearing reviews and at the hearing by present counsel.  (*Id.*) The ALJ issued his decision on June 18, 2013.  (R. 7, 22.)

At the time of the ALJ's decision, Ms. Roache was forty-eight years old and had previous work experience as a prep cook (last worked in February 2012, which is when she alleges she became disabled) and as a telephone solicitor.  She suffered a stroke in October 2011.  She alleged that she has since suffered from constant headaches that cause dizziness and loss of balance.  She alleged that she has radiating pain through her right leg and buttock, at a level of 8 or 9, on a 10-point scale; occasional disorientation and memory loss; pain from sitting, walking, and standing; difficulty in using her right arm and hand; difficulty concentrating; weakness in her arms; and depression, which causes tiredness, confusion, and decreased sleep.  She alleged that she drops things; must use a cane for balance; cannot drive; and has been stumbling and falling.  Her right leg sometimes gave out.  She estimated that she could walk for less than a block, stand for about 10 minutes, and can sit in a car for 15 minutes before it becomes too painful.  She alleged that she lives with her mother and receives help in daily activities from her mother and sister.

At step one of the sequential evaluation process, the ALJ found that Ms. Roache had not engaged in substantial gainful activity since March 29, 2012, the date of her application.[2]  At step two, he found that Ms. Roache has the severe impairments of post-cerebrovascular accident (stroke), affective disorder (depression), hypertension (high blood pressure), borderline diabetes mellitus, and neuropathy.  He found that her osteoarthritis is not severe.  At step three, the ALJ found that Ms. Roache does not have an impairment or combination of impairments that meets, or medically equals the severity of, the criteria of any listing in the Listing of Impairments.  He stated that he examined listings 9.04 (hypoparathyroidism),[3] 11.04 (central nervous system vascular accident), 11.14 (peripheral neuropathies), and 12.04 (affective disorders).

For the purposes of steps four and five, the ALJ determined Ms. Roache's residual functional capacity.  He found that she has the RFC for light work with the following additional restrictions:  (1) no climbing ladders, ropes, or scaffolds; (2) may occasionally perform other postural activities; (3) only occasionally reach overhead with her right arm;

---

[2] Supplemental Security Income is not payable prior to the month following the month that the application is filed.

[3] There is no listing 9.04 in the current text of 20 C.F.R. Part 404, Subpart P, Appendix 1, Part A, 9.00  Endocrine Disorders (20 C.F.R. Parts 400 to 499 (April 1, 2015)) or in the text in effect at the time of the ALJ's decision (20 C.F.R. Parts 400 to 499 (April 1, 2013)).  On April 8, 2011, the Commissioner published final notice of the removal of the listings for endocrine disorders (effective on June 7, 2011) because, due to medical-science advances in detection and newer treatments, "most endocrine disorders do not reach listing-level severity . . . ."  *Revised Medical Criteria for Evaluating Endocrine Disorders*, 76 Fed. Reg. 19692-01.  In S.S.R. 14-3p, the Commissioner issued guidance on the evaluation of endocrine disorders, other than diabetes mellitus, under the new regime.  Apparently, the ALJ mistakenly applied the outdated listing 9.04 for hypoparathyroidism.

(4) may frequently, but not continuously, handle and finger bilaterally; (5) must avoid concentrated exposure to hazards, loud noises, bright lights; and (6) limited to routine, unskilled work.  The ALJ found that, while Ms. Roache's impairments reasonably could be expected to cause the types of subjective symptoms that she alleged, her descriptions of their intensity, persistence, and limiting effects were not entirely credible.

At step four, the ALJ found that Ms. Roache's RFC prevents the performance of her past relevant work as a prep cook, short-order cook, and telephone solicitor.  At step five, he relied on the opinion of a vocational expert to find that there exists a significant number of jobs in the national economy that Ms. Roache can perform.  The vocational expert testified that the following jobs in the following numbers exist for a person with Ms. Roache's RFC and vocational factors (age, education, and skill level): final assembler (over 175,000 jobs nationally, 900 local/regional jobs), dowel inspector (over 60,000 national, 550 local/regional), and garment sorter (over 30,000 national, 400 local/regional).  The ALJ also noted the vocational expert's opinion that, even if Ms. Roache's subjective complaints were given "great weight" and she were given a sit/stand option, a significant number of jobs would exist for her at the sedentary level.

Therefore, the ALJ found that Ms. Roache was not disabled and denied her application for S.S.I. benefits.  The Social Security Administration's Appeals Council denied Ms. Roache's request to review the ALJ's decision, (R. 1), which made the ALJ's

decision the final decision of the Commissioner on Ms. Roache's claim and the one that this Court reviews.

## Discussion

Ms. Roache asserts three errors in the ALJ's decision.

**1.  Satisfaction of Listing 11.04.**  Ms. Roache argues that the ALJ's decision that her impairments do not satisfy Listing 11.04 suffers from three errors:  (1) he ignored or rejected evidence that proved that she was disabled; (2) he failed to specifically mention Listing 11.04B; and (3) he acted without a medical advisor's expert opinion and, thus, based his decision on only his layjudgment.  (*Plaintiff's Brief in Support of Complaint to Review Decision of Social Security Administration* [doc. 18] ("*Brief*"), at 10.)

Listing 11.04 reads:

> 11.04   *Central nervous system vascular accident.*   With one of the following more than 3 months post-vascular accident.

>  A.   Sensory or motor aphasia[4] resulting in ineffective speech or communication; or

---

[4] [This Court's note:]  "Aphasia is a neurological disorder caused by damage to the portions of the brain that are responsible for language.  Primary signs of the disorder include difficulty in expressing oneself when speaking, trouble understanding speech, and difficulty with reading and writing.  Aphasia is not a disease, but a symptom of brain damage.  Most commonly seen in adults who have suffered a stroke, aphasia can also result from a brain tumor, infection, head injury, or dementia that damages the brain.  It is estimated that about 1 million people in the United States today suffer from aphasia.  The type and severity of language dysfunction depends on the precise location and extent of the damaged brain tissue."  National Institutes of Health, National Institute of Neurological Disorders and Stroke, NINDS Aphasia Information Page, http://www.ninds.nih.gov/disorders/aphasia/aphasia.htm (last visited Jan. 21, 2016).

B.  Significant and persistent disorganization of motor function in two extremities, resulting in sustained disturbance of gross and dexterous movements, or gait and station (see 11.00C).

20 C.F.R. Part 404, Subpt. P, App. 1, Pt A. § 11.04.  The referred 11.00C reads:

C.  *Persistent disorganization of motor function* in the form of paresis[5] or paralysis, tremor, or other involuntary movements, ataxia[6] and sensory disturbances (any or all of which may be due to cerebral, cerebellar, brain stem, spinal cord, or peripheral nerve dysfunction) which occur singly or in various combinations, frequently provides the sole or partial basis for decision in cases of neurological impairment.   The assessment of impairment depends on the degree of interference with locomotion and/or interference with the use of fingers, hands, and arms.

*Id.*, § 11.00C.

**a. Ignored evidence.**  In support of her first argument, Ms. Roache identifies five categories of evidence, or facts, that the ALJ "ignored or rejected":  **(1)** hospital treatment records in October, 2011, and January, 2012, that prove that she had suffered a stroke; **(2)** physical examinations that determined that she had weakness and numbness in her right arm and right leg; **(3)** Dr. Leiphart's observations that Ms. Roache walked unsteadily, had

---

5 [This Court's note:]  "A somewhat vague term referring to an incomplete or slight paralysis, sometimes to mere weakness of a limb."  J. E. Schmidt, *Attorneys' Dictionary of Medicine* (2014), available on Lexis at 4-P Attorneys' Dictionary of Medicine P-89684.

6 [This Court's note:]  "Loss of muscular coordination (the purposeful working together of groups of muscles), resulting in irregularity of muscular movements.  There are many causes, most of them attributable to disturbances of the nervous system."  *Attys' Dict. of Med.* (available on Lexis at 1-A Attorneys' Dictionary of Medicine A-12170).

a history of falling, and used a cane "to prevent this"; and **(4)** Ms. Roache's report that she can no longer sew, which proves impairment of dexterous movements.  (*Brief*, at 11.)

**Hospital treatment records.**  Contrary to Ms. Roache's argument, the ALJ specifically discussed the hospital records of both her October 2011 and January 2012 visits, (R. 15),[7] and the ALJ accepted that she had suffered a stroke, (R. 12 (finding that she has the severe impairment of post cerebrovascular accident)).  The ALJ did not ignore or reject the cited records.

**Physical examinations.**  Ms. Roache fails to identify the allegedly ignored "physical examinations" that determined that she had weakness and numbness in her right arm and right leg and the Court will not do the work for her.  However, the Court does note that the ALJ specifically mentioned record evidence that could relate to right-extremity weakness and numbness.  (See, *e.g.*, R. 15 (hospital record of complaints of right arm pain and weakness); 16, ¶ 2 (right-hand numbness); 16 ¶ 3 (reports of difficulty with lifting with right arm and inability to stand on either leg alone); 16 ¶ 4 (complaints that she suffers from muscle weakness, inability to use her right hand, and inability to stand for extended periods); 17 ¶ 2 (showing difficulty ambulating); and 17 ¶ 4 (observed mild motor deficits on her right side).

---

[7] The Court reads the ALJ's decision as a whole.  There is no requirement that ALJs repeat their discussions or analyses of the evidence in both the step-three and RFC sections of their decisions.  *Rice v. Barnhart*, 384 F.3d 363, 370 n. 5 (7th Cir. 2004).

11

**Dr. Leiphart's observations.**   The ALJ discussed Dr. Leiphart's report of her psychological examination of Ms. Roache.  (R. 16-17.)  Although Ms. Roache is correct that he did not specifically mention Dr. Leiphart's observation that "[s]he walked unsteadily", (R. 274), he did note elsewhere Ms. Roache's reports of suffering many falls and her asserted need for a cane, (R. 15, ¶ 2); an examination observation of difficulty ambulating, some of which appeared to be exaggerated, (R. 17, ¶ 2); and an examination observation of mild motor deficits on her right side, (R. 17, ¶ 4).  The ALJ also noted examination reports of normal movement, (R. 15, ¶ 4); stable gait, (R. 16, ¶ 3); and observing Ms. Roache walking quickly to her car, post-examination, without using her cane, (R. 18, ¶ 3).  The ALJ also noted her testimony at the hearing that she uses a cane only sometimes, which he found was inconsistent with her reports of using it for weight-bearing purposes.  (R. 18, ¶ 3.)  Thus, the ALJ was well aware of, and discussed, evidence of Ms. Roache's alleged difficulties ambulating, and he was well aware of Dr. Leiphart's report and her report of a history of falling.  Ms. Roache fails to explain how the ALJ's omission of a specific mention of Dr. Leiphart's observation that "She walked unsteadily," amounts to error in the context of his entire decision.  Finally, as noted above, the ALJ did note that, "[p]rior to [Dr. Leiphart's] examination, the claimant reported that she suffers from falls often," (R. 16, ¶ 4), contrary to Ms. Roache's assertion that he ignored that observation.

Contrary to Ms. Roache's assertion, the ALJ did mention Dr. Leiphart's note that Ms. Roache reported using a cane, (R. 16, ¶ 4; 274), and he noted elsewhere in his decision, Ms. Roache's testimony and reports to other examiners that she needs or uses a cane, and her noted their and his own, observations of her use of a cane.  The ALJ did not ignore this evidence.

**Sewing report.**  Finally, Ms. Roache argues that the ALJ ignored her report to Dr. Leiphart that she could no longer sew, "thus proving impairment of dexterous movements."  (*Brief*, at 11; R. 275.)  Dr. Leiphart wrote:  "Cognitive and physical difficulties with sewing and other activities were reported.  'I used to sew all the time,' but no longer can.  'I completed certificate forklift' and could not do that job, she stated."  (R. 275.)  Although Ms. Roache is correct that the ALJ did not specifically mention this item in Dr. Leiphart's report, the fact that the record of Ms. Roache's statement does not indicate any symptoms or physical limitations that caused her to give up sewing means that it fails to provide direct support for a finding of "sustained disturbance of . . . dexterous movements."   (Because Dr. Leiphart was conducting a psychological examination of Ms. Roache, it would not be expected that she would delve into or evaluate those particulars.)  The ALJ noted Ms. Roache's report to Dr. Leiphart that she was unable to use her right hand, (R. 16, ¶ 4; 274), and Ms. Roache's report to Dr. Sonderman that she could not button her clothing, (R. 16, ¶ 3).  But the ALJ also noted Dr. Sonderman's observation that, despite Ms. Roache's assertion, she could pick up a

13

coin from the table, tie shoes, zip clothing, and dress and undress herself with no problem, (R. 16, ¶ 3), and the various expert opinions that found no functional limitations due to her impairments, (*id.*). Ms. Roache has not shown that the lack of any specific mention by the ALJ of her report to Dr. Leiphart that she gave up sewing is significant or shows error.

**b. Failure to cite 11.04B.** Ms. Roache argues that the Commissioner's denial of benefits must be reversed solely because the ALJ failed to mention Listing 11.04B. (*Brief*, at 11.) He cited Listing 11.04, but without the subpart B. However, as quoted above, there are only two subparts to Listing 11.04 and subpart A addresses aphasia resulting in ineffective speech or communication more than three months after vascular accident. Ms. Roache does not assert this condition and points to no evidence supporting it in the record.[8] Because it is obvious that only subpart B applies, the ALJ did not err by not citing subpart B specifically.

**c. Lack of medical advisor and making medical judgments.** Ms. Roache's only development of this argument is the following:

> The ALJ erroneously rejected the treating-examining physicians' functional findings simply because they were contrary to the ALJ's unqualified medical opinion, requiring reversal of the denial decision. *Murphy v. Astrue*, 496 F3d 630, 634 (7th Cir. 2007)("we have explained that an ALJ

---

[8] In fact, the ALJ specifically noted positive evidence of Ms. Roache's normal communication ability. He noted that, during her initial hospital visit in October 2011 due to her stroke, she demonstrated "normal speech" and "fluent" speech on discharge. (R. 15, ¶ 5.) The ALJ noted that, in Dr. Sonderman's May, 2012, report of his consultative examination, he reported observing "fluent speech." (R. 16, ¶ 3.)

cannot disregard medical evidence simply because it is at odds with the ALJ's own unqualified opinion.").

(*Brief,* at 12.)  Ms. Roache fails to identify the treating-examining physicians' *functional findings* that the ALJ rejected or the medical judgments that he made and the Court will not search the record for them or evaluate them.  As such, the argument is forfeited and no error is shown.  (Ms. Roache separately argues that the ALJ failed to call a medical expert specifically on the subject of listings medical equivalency, and that argument will be addressed below.)

That resolves the arguments that were clearly raised in Ms. Roache's brief in support of her complaint.  In her reply, she argues that the ALJ's Listing 11.04 discussion was perfunctory:  he did not relate the clinical findings in the record to any listing criteria and failed to adequately articulate why Ms. Roache's combined impairments did not meet or equal a listing criteria.  (*Plaintiff's Response to Defendant's Memorandum* [doc. 22] ("*Reply*"), at 3, 4.)  This argument was not clearly stated or developed in her opening brief and arguments or issues raised for the first time in reply are usually forfeited.  *Pain Center of SE Indiana, L.L.C. v. Origin Healthcare Solutions, L.L.C.,* No. 1:13-cv-133-RLY-DKL, *Entry on Plaintiffs' Objection to the Magistrate Judge's May 8, 2015 Entry* [doc. 258], at 12-13, 2015 WL 4548528, *6 (S.D. Ind., July 28, 2015).  However, in its discretion, the Court will address the argument, particularly because the Commissioner addressed it in her response.

The ALJ's step-three discussion of Listing 11.04 consists, in its entirety, of the following:

> **3.   The claimant does not have an impairment or combination of impairments that meets or medically equals the severity of one of the listed impairments in 20 CFR Part 404, Subpart P, Appendix 1 (20 CFR 416.920(d), 416.925 and 416.926).**
>
> The claimant's medically determinable severe physical impairments do not medically meet or equal the criteria for any listed impairments, but specifically those under 9.04, 11.04 and 11.14.  While the claimant may allege she meets or equals the listings, her allegations are not sufficiently substantiated, and the medical evidence of record fails to document clinical findings of any physician that suggest the claimant's impairments satisfy the severity requirements contained in 20 CFR Part 404, Subpart P, Appendix 1 (20 CFR 404.1526, 416.920 (d), 416.925 and 416.926).

(R. 13.)  (For the remainder of his step-three discussion, the ALJ articulates his evaluation of record evidence against the criteria of Listing 12.04 (affective disorders).)  This discussion is only a series of conclusory statements.  The ALJ fails to describe the criteria of Listing 11.04B, what record evidence he considered as to each criterion, or why that evidence fails to satisfy the criterion.  Although his articulation is certainly perfunctory, the Court must consider whether the ALJ's error is harmless — in other words, whether a remand might lead to a different result.  *Schomas v. Colvin*, 732 F.3d 702, 708 (7th Cir. 2013) ("[W]e will not remand a case to the ALJ for further explanation if we can predict with great confidence that the result on remand would be the same.");  *Fisher v. Bowen*, 869 F.2d 1055, 1057 (7th Cir. 1989) ("No principle of administrative law or common sense requires us to remand a case in quest of a perfect opinion *unless there is reason to believe that the remand might lead to a different result.*" (emphasis added)).

16

In her reply, Ms. Roache points to the following evidence of functional limitations that the ALJ failed to relate to the criteria of Listing 1104B. (*Reply*, at 3.)

**(1)** "[S]he had impaired motor function because of weakness and numbness in her right arm and right leg," (*Reply*, at 3.)   In her opening brief, she cited "[p]hysical examinations [that] determined she had weakness and numbness in her right arm and right leg.  (R. 235-236, 229, 231, 224-226, 220-222)."  (*Brief*, at 11.)  Each reference will be examined in turn.

R. 235-36 is a "History and Physical" report that was generated upon her admission to the hospital in October 2011 for her stroke.   Under "History of Present Illness," the report notes that "[t]he patient reports a onset of right-sided numbness and weakness at 06:45 p.m."   (R. 235.)   The report notes "No limitation of motion" on musculoskeletal examination and "Normal tones and reflexes" on neurologic/motor examination.  (R. 236.)  Obviously, this report does not support a physical-examination *finding* of "impaired motor function" or "weakness and numbness in her right arm and right leg," as Ms. Roache contends.  At most, the report records Ms. Roache's *self report* of an onset of numbness and weakness in some part or parts of her right side, and no report of motor impairment.   There are no clinical findings or observations of motor-function impairment or right arm/leg weakness or numbness in this report.

R. 229 and 231 are within the October 2011 Discharge Summary for Ms. Roache's initial hospitalization.  It records the admitting diagnosis of "Right-sided numbness and weakness" and that Ms. Roache "presents with acute onset right-sided numbness and

weakness." (R. 229, 230.)  As such, it only records her self-reported symptoms.  Under the neurologic section of her physical-examination results, the report reads:  "Mild weakness (5-/5) in the distal[9] right upper extremity.  Sensory with mild paresthesias[10] of the distal right upper extremity and below the knee on the right lower extremity.  . . . Gait unremarkable, stable."  (R. 231.)  Under the musculoskeletal-examination section, the report notes "strength 4/5 on the right upper extremity and full throughout the rest." (R. 230.)  No functional or motor restrictions are diagnosed or prescribed.  Recording, as it does, objective findings of only mild weakness and tingling in Ms. Roache's right hand and tingling below her right knee, this report does not support any likelihood that the ALJ would find satisfaction of Listing 11.04B on remand based on these notations.

R. 224-26 is a January 2012 Consultation Note that was generated during a second hospitalization, three months after Ms. Roache's initial stroke hospitalization.  It notes that she was hospitalized "due to the presence of numbness over the right hand and right foot," (R. 224, 225), and that "[s]he denied . . . weakness over the upper or lower extremities . . . ."  (R. 224.)  She appeared to be in no acute distress.  (R. 225.)  In the neurologic section of her physical examination, the physician wrote:  "On motor exam

---

[9] [This Court's note:]  "With regard to the body as a whole, farthest from the trunk or head, and in the case of a limb, also farthest from its attachment to the trunk."  *Attys' Dict. of Med.*, "distal" (available on Lexis at 2-D Attorneys' Dictionary of Medicine D-3621).  The Court assumes that the distal right upper extremity is the hand.

[10] "An abnormal sensation of tingling, burning, crawling, or tickling. It occurs in some forms of neuritis, in certain abnormal conditions of the spinal cord, etc."  *Attys' Dict. of Med.*, "paresthesias" (available on Lexis at 4-P Attorneys' Dictionary of Medicine P-89686.

over the upper extremities and lower extremities, the patient disclosed full strength in all muscle groups tested." (R. 225.) Gait examination was deferred. (*Id.*) Mr. Roache complained only of numbness, not weakness, and only over her right hand and foot, not all of her right arm and leg. She had full strength in both right extremities. No motor deficits were diagnosed. This reference does not support satisfaction of the Listing criteria.

Finally, R. 220-22 is the Discharge Summary for Ms. Roache's January 2012 hospitalization. It notes, again, that she was admitted for complaints of right-hand and -foot numbness, (R. 220), and "acute onset right hand/foot 'tightness' and burning pain and right leg heaviness, states symptoms similar to prior [stroke] . . . ," (R. 221). The report notes that "Neurology felt that her symptoms were likely residual from her [stroke] in 10/2011." (R. 221.) Her discharge condition was "Good" and she was discharged with no limitations. (R. 222.)

At most, Ms. Roache contends that these reports show that "[p]hysical examinations determined that she had weakness and numbness in her right arm and right leg." (*Reply*, at 11.) They do not. They record her reports of symptoms, not medical findings, and only the records of the October, 2011, hospitalization record her report of right-side numbness and weakness, that might include all of her leg and arm. The reports were generated in October, 2011, and January 2012, not later. None of the reports include findings or prescriptions of functional limitations in motor-function, gross or dexterous

movement, or gait and station.  In short, this evidence does not support a likelihood that, if given an opportunity to rearticulate on remand, the ALJ would find a "[s]ignificant and persistent disorganization of motor function in two extremities, resulting in sustained disturbance of gross and dexterous movements, or gait and station . . . ." as required by Listing 11.04B.

**(2)** Next, Ms. Roache points to the evidence that "she was observed to walk unsteadily and she had a history of falling."  (R. 3.)  This refers to Dr. Leiphart's report addressed above.  Dr. Leiphart, a psychological consulting examiner, simply recorded her observation that Ms. Roache walked unsteadily, without attributing it to any cause (*e.g.*, significant and persistent disorganization of motor function in two extremities) or characterizing its severity (*e.g.*, sustained disturbance of gross movement, or gait and station).  In addition, as explained above, Dr. Leiphart's notation that Ms. Roache had a history of falling was only her recording of Ms. Roache's report and the ALJ had mentioned her alleged history of falling.

**(3)** Ms. Roache asserts that the ALJ ignored her need for a cane to prevent falling. (*Reply*, at 3.)  She included this fact in her initial brief, (*Brief*, at 11), and, as explained above, the ALJ did mention and evaluate evidence regarding Ms. Roache's self-reports of needing a cane, including Dr. Leiphart's note.  Ms. Roache is mistaken.

**(4)** Finally, Ms. Roache cites Dr. Leiphart's note that she reported that she could no longer sew, which she contends shows impaired dexterous movements.  (*Reply*, at 3.)

20

As discussed above, a self-report of inability to sew, alone, is not substantial evidence of impaired dexterous movements and the ALJ addressed other evidence of Ms. Roache's ability to perform dexterous movements and, ultimately, found it wanting.

In sum, Ms. Roache has not shown any reason to believe that a remand for re-articulation of the ALJ's listings analysis might lead to a different decision on her claim. The evidence that she cites does not amount to substantial evidence that the criteria of Listing 11.04B are satisfied. While the Court agrees that the ALJ certainly should have better explained his evaluation of the relevant record evidence in relation to the listing criteria, the Court is convinced that the result on remand would be the same. Therefore, Ms. Roache has not shown grounds for a remand.

**2. Failure to summon a medical advisor.** Ms. Roache argues that the ALJ erred by failing to call a medical advisor on the subject of medical equivalence to the Listings. Apparently recognizing that the ALJ may rely on the state-agency reviewers for the required medical-equivalence expert opinion, Ms. Roache's argues that the reviewers' opinions cannot be relied upon because they "did not consider all of the evidence in the record. They did not review the 2-5-13 neurological evaluation which determined that she continued to have motor deficits more than 14 months after her October, 2011 stroke. Presumably if they had reviewed all of the evidence they would have reasonably determined she was totally disabled." (*Brief*, at 15.) The neurological evaluation to which she refers is the examination performed by Cristine S. Ivan, M.D., as a follow-up to her

October, 2011, stroke hospitalization.   (*Brief*, at 4; R. 345-46.)   Under the physical-examination section of the report, Dr. Ivan wrote "There is mild motor deficit on the right." (R. 346.)  Dr. Ivan offers no further information about the motor deficits, *e.g.*, the nature of the deficits or the clinical findings that support her opinion.  Ms. Roache does not explain how this one sentence, in the context of all of the other evidence of record, carries so much weight on the issue of medical equivalence that a new expert medical opinion was required.  The Court cannot do the analysis and make the argument for her. Dr. Ivan did specify that the deficits were "mild," which does not help Ms. Roache's argument, despite the fourteen months since her stroke.  "Mild motor deficits" does not reasonably indicate equivalence to the severity of Listing 11.04B.  The listing requires "[s]ignificant and persistent disorganization of motor function" that results in "sustained disturbance of gross and dexterous movements, or gait and station."   A bare report of "mild motor deficits" does not reasonably suggest medical equivalence to that level of severity such that a new medical opinion was required.  In addition, it does not show that it is reasonably likely that a remand for a new medical opinion would produce a different result.

Therefore, Ms. Roache has not shown that the ALJ committed reversible error by not obtaining a new medical expert opinion on the question of Listings medical equivalence.

**3. Step-five determination.** Ms. Roache argues that the ALJ erred in his step-five finding, but her argument actually asserts that the ALJ erred in his RFC finding:

> The denial decision must be reversed because the ALJ's residual functional capacity assessment did not accurately describe the claimant's impairments. The ALJ impermissibly failed to account for the claimant's dizziness and loss of balance causing falls, pain in her right leg and buttocks, disorientation, impaired memory, and impaired use of her hands causing her to drop things and to be unable to sew.
>
> The denial decision must be reversed because the ALJ's residual functional capacity assessment did not accurately describe the claimant's impairments.

(*Brief,* at 18 (citations omitted).) Ms. Roache does not identify any errors in the ALJ's interpretations of evidence or opinions, his evaluations of the relative weights to accord the evidence and opinions, or his determination of Ms. Roache's credibility. Conclusorily stated as it is, Ms. Roache's argument amounts to only a plea for a different decision by the ALJ or for the Court to undertake a *de novo* review of the evidence. However, it is Ms. Roache's burden to show that the ALJ's decision is not supported by substantial evidence and the Court may not reweigh the evidence and come to its own claim decision. Ms. Roache has not shown that the ALJ's RFC determination is not supported by substantial evidence.

## Recommendation

Ms. Roache has not shown that the Commissioner's denial of her claim for disability benefits is not supported by substantial evidence or is legally erroneous.

Judgment should be entered in favor of the Commissioner, affirming her denial of Ms. Roache's claim.

### Notice regarding objections

Within fourteen days after being served with a copy of this recommendation, either party may serve and file specific written objections thereto. 28 U.S.C. ▪ 636(b); Fed. R. Civ. P. 72(b)(2). A district judge shall make a *de novo* determination of those portions of the recommendation to which objections are made. 28 U.S.C. ▪ 636(b); Fed. R. Civ. P. 72(b)(3).  Failure to file an objection might result in forfeiture of the right to de novo determination by a district judge and to review by the court of appeals of any portion of the recommendation to which an objection was not filed. *Tumminaro v. Astrue*, 671 F.3d 629, 633 (7th Cir. 2011); *United States v. Pineda-Buenaventura*, 622 F.3d 761, 777 (7th Cir. 2010); *Schur v. L. A. Weight Loss Centers, Inc.*, 577 F.3d 752, 761 n. 7 (7th Cir. 2009); *Kruger v. Apfel*, 214 F.3d 784, 787 (7th Cir. 2000); *Johnson v. Zema Systems Corp.*, 170 F.3d 734, 739 (7th Cir. 1999).

**DONE this date:** 01/26/2016

*Denise K. La Rue*

Denise K. LaRue
United States Magistrate Judge
Southern District of Indiana


Distribution to all ECF-registered counsel of record *via* ECF-generated e-mail.